UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMIE Y., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-03040-TWP-TAB |
| | ) | |
| ANDREW M. SAUL, Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jamie Y.[1] requests judicial review of the final decision of the Commissioner of the

Social Security Administration (the "SSA"), denying her applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  For

the following reasons, the Court **affirms** the decision of the Commissioner.

## I.    PROCEDURAL BACKGROUND

On January 6, 2016, Jamie Y. protectively filed applications for DIB and SSI, alleging a

disability onset date of September 25, 2015.  (Filing No. 10-2 at 11.)  Her applications were

initially denied on April 19, 2016, (Filing No. 10-4 at 4; Filing No. 10-4 at 9), and upon

reconsideration on July 19, 2016, (Filing No. 10-4 at 26; Filing No. 10-4 at 30).  Administrative

Law Judge Daniel Mages (the "ALJ") conducted a hearing on June 13, 2018, at which Jamie Y.,

represented by counsel, and a vocational expert ("VE"), appeared and testified.  (Filing No. 10-2

at 37-59.)  The ALJ issued a decision on August 15, 2018, concluding that Jamie Y. was not

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

entitled to receive benefits.  (Filing No. 10-2 at 8-21.)  The Appeals Council denied review on May 16, 2019.  (Filing No. 10-2 at 2.)  On July 22, 2019, Jamie Y. timely filed this civil action, asking the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to review the final decision of the Commissioner denying her benefits.  (Filing No. 1.)

## II.    STANDARD OF REVIEW

Under the Social Security Act, a claimant may be entitled to benefits only after she establishes that she is disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors.  20 C.F.R. § 404.1520(a)(4)(i).[2]  At step two, if the claimant does not have a "severe" impairment that also meets the durational requirement, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing

---

[2] The Code of Federal Regulations contains separate, parallel sections concerning DIB and SSI, which are identical in most respects.  *See, e.g.*, 20 C.F.R. § 416.920(a)(4)(i).  The Court will take care to detail any substantive differences that are applicable to the case but will not always reference the parallel section.

of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then her residual functional capacity will be assessed and used for the fourth and fifth steps. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v). Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work, given her RFC and considering her age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if she can perform any other work in the relevant economy. *Id*.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft*, 539 F.3d at 678, this Court

must accord the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id*. (citation omitted).

## III.   FACTUAL BACKGROUND

When Jamie Y. filed, she alleged she could no longer work because of degenerative disc diseases, a pars defect, and her legs giving out/falling. (Filing No. 10-7 at 7.) She has completed the tenth grade. (Filing No. 10-2 at 39.) She has worked in fast food service, retail, as a server, and home health aide.[3] (Filing No. 10-7 at 8.)

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Jamie Y. was not disabled. (Filing No. 10-2 at 21.) The ALJ found that Jamie Y. last met the insured status requirements of the Social Security Act on September 30, 2017 (her date last insured).[4] (Filing No. 10-2 at 13.) At step one, the ALJ

---

[3] The relevant evidence of record is amply set forth in the parties' briefs, as well as the ALJ's decision and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[4] Jamie Y. must prove the onset of disability on or before her date last insured to be eligible for DIB. *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012); *see also* 20 C.F.R. § 404.131. Recognizing that Jamie Y. also had a claim for SSI, the ALJ's subsequent findings considered the period at issue for that claim, beginning with the alleged onset date through the date of the decision. (*See, e.g.*, Filing No. 10-2 at 21.)

found that Jamie Y. had not engaged in substantial gainful activity[5] since September 25, 2015, the alleged onset date.  (Filing No. 10-2 at 14.)  At step two, the ALJ found that Jamie Y. had "the following severe impairments: degenerative disc disease, obesity, headaches/migraines, hypersomnia, and narcolepsy."  (Filing No. 10-2 at 14 (citations omitted).)  At step three, the ALJ found that Jamie Y. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Filing No. 10-2 at 16.)  After step three but before step four, the ALJ concluded:

> After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform a range of light work (20 CFR 404.1567(b) and 416.967(b)) defined as follows: sitting six hours during an eight-hour workday; standing and walking six hours during an eight-hour workday; lifting, carrying, pushing, and pulling twenty pounds occasionally and ten pounds frequently; occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds; no work around dangerous moving machinery or at unprotected heights; and simple routine tasks with the ability to sustain the attention and concentration necessary to carry out work-like tasks with reasonable pace and persistence.

(Filing No. 10-2 at 17.)  At step four, the ALJ found that Jamie Y. was unable to perform any of her past relevant work as a cashier checker and home attendant.  (Filing No. 10-2 at 19.)  At step five, considering Jamie Y.'s age, education, work experience, and RFC, as well as the VE's testimony, the ALJ concluded that Jamie Y. could have performed other work through the date of the decision with jobs existing in significant numbers in the national economy in representative occupations, such as a mail clerk, office machine operator, and information clerk.  (Filing No. 10-2 at 20-21.)

---

[5] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

## IV.    DISCUSSION

Jamie Y. raises three assignments of error, arguing that the ALJ failed to: (1) properly weigh the medical opinion evidence, (2) find a severe mental impairment, and (3) properly consider Jamie Y.'s testimony.  The Court will address the arguments in turn.

### A.    Opinion Evidence

Jamie Y. contends that the ALJ gave inadequate reasons for assigning greater weight to the state agency reviewing consultants' assessments than her treating physician's opinion.  (Filing No. 12 at 12-13.)

Based on the filing date of Jamie Y.'s applications, the treating physician rule applies. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies to claims filed before March 27, 2017).  In *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)), the Seventh Circuit held that a "treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record."  *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician."  *Scott*, 647 F.3d at 739 (citing *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306).  "And even if there had been sound reasons for refusing to give [a treating physician's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit."  *Scott*, 647 F.3d at 740 (citing *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010)).  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's

opinion." *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); *see* 20 C.F.R. § 404.1527(c). However, so long as the ALJ "minimally articulates" his reasoning for discounting a treating source opinion, the Court must uphold the determination. *See Elder v. Astrue,* 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527).

The ALJ considered the treating source statement of Rebecca Seigel, M.D. ("Dr. Seigel"), dated February 9, 2018. (Filing No. 10-2 at 18.) However, the ALJ gave "little weight" to the opinion. (Filing No. 10-2 at 19.) The ALJ noted that Dr. Seigel had assessed Jamie Y.'s capabilities as being consistent with less than sedentary exertional work, she would be likely to miss more than four days of work per month, and that her pain would frequently interfere with her attention and concentration. (Filing No. 10-2 at 18.) Dr. Seigel's assessment included that Jamie Y. was limited to standing/walking for 60 minutes both at one time and total in an eight-hour workday, sitting 30 minutes at one time and 60 minutes total, occasionally lifting ten pounds, and frequently lifting five pounds. (Filing No. 10-14 at 54.) The ALJ explained, in part, that "the accompanying treatment records reflect that Dr. Seigel was notified of generally normal findings on physical examination (*e.g.*, Exhibit 17F/6-7). Further, her statement does not include any explanation for the limitations assigned. Finally, Dr. Seigel is not a specialist." (Filing No. 10-2 at 19.)

The ALJ's reasoning relied on relevant factors. His application of those factors was supported by substantial evidence. Dr. Seigel was Jamie Y.'s primary care physician, not a specialist. (Filing No. 10-2 at 52.) Dr. Seigel provided her assessment by completing a form that indicated Jamie Y.'s work related limitations, but Dr. Seigel left blank the portion of the form asking her to specify the supporting diagnoses based on clinical and objective findings. (Filing

No. 10-14 at 54.)  The regulations instruct the ALJ to consider "consistency" with "the record as whole" when determining the weight that should be given a medical opinion.  20 C.F.R § 404.1527(c)(4).  The regulations also instruct the ALJ to consider the "supportability" of a medical opinion, which refers to the relevant evidence presented by the source to support the opinion, including "particularly medical signs and laboratory findings."  20 C.F.R. § 404.1527(c)(3).  However, the regulations specify that the supportability factor is more relevant to weighing opinions from "nonexamining sources."  *Id.*  Presumably, the relative distinction is appropriate because treating or examining opinions can be compared for consistency with their corresponding treating notes or examination findings.  *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (A treating source statement can be discounted if not properly explained and the treating notes do not provide any further clarification or support with objective signs).  Here, the form did not specify the objective bases of the significant limitations that were assessed including that Jamie Y. would be limited to sitting, standing, and walking for no more than two hours total in an eight-hour workday.  (*See* Filing No. 10-14 at 54.)

Dr. Seigel's treatment records did not supply any objective basis for the limitations either.  Prior to completing the assessment, Dr. Seigel had examined Jamie Y. on only two occasions.  Both examinations indicated that Jamie Y. was "in no acute distress, well developed and well nourished" and she did not have any abnormalities including with any extremity.  (Filing No. 10-16 at 51 (January 15, 2018); Filing No. 10-16 at 45 (February 9, 2018, same day as the assessment form was completed).)  Following completion of the form, Dr. Seigel's examinations revealed only a nodule joint deformity of Jamie Y.'s left wrist.  (*See e.g.*, Filing No. 10-16 at 41.)

Jamie Y. contends that the ALJ's evaluation of the opinion evidence relied on her own lay interpretation of diagnostic testing, including an x-ray and MRI of Jamie Y.'s lumbar spine, sleep

studies demonstrating hypersomnia consistent with narcolepsy, and clinical findings showing an antalgic gait, tenderness to palpitation around the spine, and pain with range of motion testing. (Filing No. 12 at 14.)  The diagnostic imaging of Jamie Y.'s lumbar spine, as well as some of the clinical findings were prior to her alleged onset date.  (*See* Filing No. 10-8 at 3-11.)  That evidence was included in the most recent review by the state agency consultant.  (Filing No. 10-3 at 43-44.) Before Jamie Y. underwent a lumbar fusion surgery in June 2016, her prior primary care physician had noted some pain with range of motion, an antalgic gait and station, and decreased ankle reflexes, but with preserved strength and sensation in the lower extremities and negative straight leg raising tests.  (Filing No. 10-11 at 46 (December 2, 2015); Filing No. 10-11 at 35 (January 28, 2016); Filing No. 10-16 at 20 (June 6, 2016).)  At the time of the latest review, the state agency consultant noted that the most recent evidence of record—three weeks after Jamie Y.'s surgery— showed that she had a normal gait, negative straight leg raising, and a normal physical examination generally.  (Filing No. 10-3 at 44.)

After discussing the surgery, the ALJ explained that postoperative examinations "were essentially normal."  (Filing No. 10-2 at 18.)  The ALJ concluded that "[t]here has been improvement with treatment."  (Filing No. 10-2 at 18.)  Accordingly, the ALJ also gave "great weight" to the reviewing consultants' assessments that Jamie Y. was capable of working at the light exertional level.  (Filing No. 10-2 at 18.)

Jamie Y. contends that the ALJ's conclusion that there was improvement with treatment was not supported longitudinally because the "temporary" improvement did not persist during the period following the last consultant's review.  (Filing No. 12 at 15.)  As such, Jamie Y. argues that it was error for the ALJ to rely on the state agency opinions.  (Filing No. 12 at 15.)  Jamie Y. cites

to the record for the proposition that "[b]y October 6, 2016, [her] symptoms were 'worse (in back area) compared to their preoperative state.'" (Filing No. 12 at 15 (citation omitted).)

However, the ALJ's conclusion is supported by substantial evidence. On July 7, 2016, Jamie Y.'s treating spinal surgeon noted that "[o]verall she is doing well. The symptoms that she had prior to surgery have resolved completely. [. . .] She has a normal lower extremity neurologic exam. I'm very pleased with her progress at this time as is she." (Filing No. 10-14 at 37.) On October 6, 2016, at the next follow-up visit, Jamie Y. did present with complaints of pain that were described as worse than before her surgery and "severe," but it was noted that she was not taking any pain medications. (Filing No. 10-14 at 45.) From the same treatment visit, the treating specialist's assessment was as follows:

> Overall she is doing very well. The pain symptoms that she had prior to surgery have resolved completely in her lower extremities. She does describe soreness that she has in her low back region intermittently. Unfortunately she has not done any of her physical therapy that was requested 2 months ago. According to Jamie the physical therapist that she sought that time did not feel as though she needed any physical therapy regimen. She has a normal lower extremity neurologic exam. Her incision is well-healed at this time. I had a lengthy discussion with Jamie today regarding her overall condition and my thoughts.
>
> Plan: My recommendation at this time will be that we have Jamie begin a structured physical therapy program to work on strengthening her core and lumbar region. I do believe that her intermittent soreness in her low back region is likely as a result of her failure to rehabilitate her lumbar region appropriately. I'm also okay with her taking an anti-inflammatory medication at this time. I am going to release her from her restrictions altogether at this time. I have encouraged her to ease back into her normal activities. I will see her back at this time on an as-needed basis. She knows to call the office if she is not doing well and we will see her back at that time if that be the case.

(Filing No. 10-14 at 47.) When Jamie Y. returned almost a year later for her last treatment visit with the provider, his assessment was as follows:

> Jamie is seeing me today for the symptoms as stated above. In the last 2-3 months she has developed new onset low back pain that she has not had previously. She is over a year status post lumbar fusion L5-S1 for an isthmic spondylolisthesis. She

overall has been doing extremely well until the last several months. She has a normal lower extremity neurologic exam. She does have some discomfort with extension of her lumbar region. I had a significant discussion with her today regarding her overall condition as well as her imaging findings. Her fusion construct at this time appears to be stable at this time. I do not see any abnormalities with regards to her fusion level at L5-S1. I do believe that she is fairly deconditioned at this time as she has not been participating in her therapeutic exercises.

Plan: My recommendation at this time is that we have Jamie begin taking an anti-inflammatory medication on a regular basis. I am going to have her begin a structured physical therapy program. I will see her back at this time on an as-needed basis. Ultimately if her symptoms however are not improving after completion of therapy she should notify us and I would have her see one of my nonoperative partners for further therapeutic evaluation.

(Filing No. 10-14 at 52.) The ALJ also cited to the examination findings during a neurological consultation for narcolepsy and headaches, on March 16, 2018, that revealed normal extremity strength and tone without tremor, normal reflexes, intact sensation, and a normal, steady gait and station. (Filing No. 10-15 at 54-56.) Jamie Y. has not developed that there was any objective indication that her back problems progressed after her surgery. As such, the ALJ did not err by giving weight to the state agency consultants' assessments of Jamie Y.'s exertional limitations.

Moreover, there is no indication that Dr. Seigel relied on any of the objective evidence identified by Jamie Y. as the basis of her opinion. Nor is there support for the proposition that Dr. Seigel had the most accurate view of Jamie Y.'s functional limitations "based on appropriate medical findings documented over a longitudinal period of treatment . . . ." (Filing No. 12 at 15.) Jamie Y.'s testimony confirmed that Dr. Seigel began treating her in January 2018. (Filing No. 10-2 at 52.) Even after the assessment was completed, Dr. Seigel's treatment notes show that she still had never seen the results of Jamie Y.'s sleep study. (Filing No. 10-16 at 40.) As detailed above, Dr. Seigel had treated Jamie Y. on only two occasions before the assessment and both examinations were completely normal. Dr. Seigel was aware of Jamie Y.'s surgical history,

including her lumbar fusion.  (Filing No. 10-16 at 50.)  The Seventh Circuit has explained that "[m]ore weight is given to the opinion of a treating physician because of their greater familiarity with the claimant's conditions and circumstances."  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see* 20 C.F.R. § 404.1527(c)(2)(i)-(ii).  However, it "would be exceedingly illogical to credit a doctor's opinion because [she] is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail*[ed] *or longitudinal view*."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis in original).  Accordingly, the ALJ provided good reasons for discounting Dr. Seigel's opinion.  As such, the Court does not find reversable error based on the ALJ's evaluation of the opinion evidence.

## B.   Mental Impairments

Jamie Y. contends that the ALJ erred by finding that her depression, anxiety, and personality disorders were not severe impairments.  (Filing No. 12 at 16-17.)  Specifically, she asserts as a matter of law that such a finding at step two is inconsistent with her diagnosis of major depressive disorder.  (Filing No. 12 at 17.)  She asserts that even though the ALJ continued with the sequential evaluation based on her severe physical impairments, there was no consideration given to her mental impairments at the later steps.  (Filing No. 12 at 18.)  Jamie Y. contends that this was prejudicial error because her mental impairments "would likely impact a finding of how often she is off task or her work pace . . . ."  (Filing No. 12 at 18.)

The SSA's regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a).  The Seventh Circuit has explained that "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the

evaluation process." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010) (citing 20 C.F.R. § 404.1523; *see Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003) ("[h]aving found that one or more of [appellant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of the entire constellation of ailments—including those impairments that in isolation are not severe.")).  "Therefore, the step two determination of severity is 'merely a threshold requirement.'" *Castile*, 617 F.3d at 927 (quoting *Hickman v. Apfel,* 187 F.3d 683, 688 (7th Cir. 1999)).

The ALJ found that Jamie Y.'s diagnosed mental impairments did not "singly and in combination . . . cause more than minimal limitation in her ability to perform basic mental work activities . . . ."  (Filing No. 10-2 at 14.)  On September 4, 2015, one of those diagnoses, major depressive disorder, was described by Jamie Y.'s treating mental health provider as being chronic, moderate, and an ongoing problem.  (Filing No. 10-11 at 28.)  In 2018, Dr. Seigel initially diagnosed Jamie Y. with major depressive disorder, "single episode, unspecified."  (Filing No. 10-16 at 51.)

The Seventh Circuit has held that it was error was for an ALJ to find that "major depression, recurrent *severe*" was not a severe impairment, even when that determination was supported by "the opinions of two state-agency psychologists who did not even examine, let alone treat," the claimant.  *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (emphasis in original). The Seventh Circuit explained "[t]hat determination is not supported by substantial evidence and, indeed, strikes us as nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'"  *Id*. (quoting *Am. Psychiatric Ass'n., Diagnostic & Statistical Manual of Mental Disorders*, 679-80 (4th ed. text revision 2000)).  The Seventh Circuit explained further that no published opinion in any circuit had found that major

depression was not a severe impairment, although two unpublished decisions "soundly reject[ed] this assertion." *O'Connor*, 823 F.3d at 697 (citations omitted).  The court concluded that when contrary to the medical judgment of the claimant's treating sources, such an assertion by the ALJ amounted to him playing doctor.  *Id.*

Here, the major depressive disorder was described as moderate rather than severe.  That distinction does not necessarily make a difference, as moderate impairments have been repeatedly held by the Seventh Circuit to warrant the need for corresponding limitations.  *See e.g.*, *Yurt v. Colvin,* 758 F.3d 850, 858-59 (7th Cir. 2014).

However, the approach that a diagnosis alone establishes the degree of functional impairment does appear to be in tension with other Seventh Circuit precedent.  *See Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (pointing to a diagnosis and saying it would hinder a claimant's ability to work is not sufficient to establish functional limitations); *see also Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).  The claimant has the burden to provide evidence of not only a medically determinable impairment, but of specific limitations affecting her capacity to work.  *See Schmidt*, 395 F.3d at 745-46; *see also Scheck*, 357 F.3d at 702; 20 C.F.R. § 404.1512(a).  Generally, a "remediable condition" is not a basis for an award of benefits.  *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004), *on reh'g*, 368 F.3d 691 (7th Cir. 2004).  The Seventh Circuit concluded that depression for which the claimant does not seek specialized treatment and is described by the claimant's primary care physician as stable and under control with medication, despite the potential to be disabling, does "'not entitle one to benefits or boost one's entitlement by aggravating another medical condition.'"  *Prochaska*, 454 F.3d at 737 (quoting *Barrett,* 355 F.3d at 1068).  Diagnostic criteria generally compare historical information with the patient's current

presentation to arrive at an assessment reflecting that point in time but does not predict the progression of the impairment as an ongoing functional concern.

Here, three months after Jamie Y.'s alleged onset date, and before she filed for benefits, she was discharged from her specialized provider—that diagnosed her with moderate chronic depression—because she was noncompliant with treatment with numerous no show, no call, missed appointments.  (Filing No. 10-11 at 31.)  When she filed for benefits, she did not list any mental health impairments as supporting her claim.  (Filing No. 10-7 at 7.)  In the form Jamie Y. filled out for the SSA to describe her functioning, she did not indicate that she had any issues with memory, concentration, understanding, following instructions, getting along with others including authority figures, or dealing with changes, though she did indicate issues with completing tasks secondary to pain and that she only sometimes did okay with stress.  (Filing No. 10-7 at 21-23.) The state agency psychological consultants did not assess Jamie Y. as having a severe mental impairment, in part, based on her mother's statements that Jamie Y. was limited with chores only because of her physical impairments and needs "no reminders or encouragement, goes out alone, doesn't drive due to medicine, can shop, can manage funds, no social issues, can deal with changes in routine, can handle stress for the most part. She believes physically disabled not psychologically."  (Filing No. 10-3 at 16; Filing No. 10-3 at 41.)

Even if a diagnosis of major depressive disorder by a treating provider establishes a severe mental impairment as a matter of law, the Court finds that any error resulting from the ALJ's contrary determination was harmless here.  *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (error may be excused as harmless if the court is confident the same result would occur on remand).  The ALJ's decision demonstrates that he considered Jamie Y.'s combined impairments, both severe and non-severe, when assessing her RFC.  The ALJ gave only "some weight" to the

reviewing psychological consultants' assessments.  (Filing No. 10-2 at 15).  The ALJ explained that "[c]onsidering the evidence in the light most favorable to the claimant but in the context of the objective medical evidence, I include[d] mental limitations in the residual functional capacity below primarily to account for the claimant's headaches, in addition to the combined effects of her conditions."  (Filing No. 10-2 at 15.)  The RFC included that Jamie Y. was limited to "simple routine tasks with the ability to sustain the attention and concentration necessary to carry out work-like tasks with reasonable pace and persistence."  (Filing No. 10-2 at 17.)

Jamie Y. implies that the relevant limitation is insufficient because she concludes that she would "likely" also have issues with remaining on task and performing at a consistent pace.  (Filing No. 12 at 18.)  However, she has not developed any basis in the medical record for the assertion that she is specifically limited with those abilities.  She has the burden to establish with medical evidence that her severe impairment resulted in that type and degree of limitation.  *See Castile v. Astrue*, 617 F.3d at 927 (citing 20 C.F.R. § 404.1512(a)).  The Court is not aware of any holding that a diagnosis of major depressive disorder means as a matter of law that a claimant will have limitations staying on task and keeping pace.  The ALJ explained that the evidence showed Jamie Y. had "sufficient concentration, persistence or pace to be able to perform household chores, drive a car, and shop in stores (Exhibit 4E/3-4).  On mental status examination, [she] demonstrated good concentration and attention span (Exhibit 7F/2)."  (Filing No. 10-2 at 15.)  Indeed, on April 22, 2016, Jamie Y.'s treating provider noted that on examination "[h]er concentration and attention span [was] good."  (Filing No. 10-12 at 3.)  Additionally, the reviewing consultants both concluded that Jamie Y. had no limitations with concentration, persistence, or pace.  (Filing No. 10-3 at 16; Filing No. 10-3 at 41.)  As such, the ALJ's determination is supported by substantial evidence. Jamie Y. has not developed that any step two error was harmful.  Remand is not necessary because

16

the ALJ included the limitation he found to be supported by the evidence of Jamie Y.'s mental impairments when considered in combination with her other impairments.

**C.**   **Subjective Symptom Evaluation**

Jamie Y. contends that the ALJ failed to properly consider her testimony. (Filing No. 12 at 18-21.) Reviewing courts examine whether a credibility determination was reasoned and supported; only when an ALJ's decision "lacks any explanation or support . . . will [the Court] declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). "Credibility determinations will not be overturned unless they are clearly incorrect. As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citations omitted); *Alvarado v. Colvin*, 836 F.3d 744, 799 (7th Cir. 2016 (same, so long as determination is tied to evidence in the record).

Jamie Y. has not raised any argument that demonstrates that the ALJ's subjective symptom evaluation was patently wrong. Jamie Y. notes several rationales advanced by the ALJ for the adverse credibility determination, including a lack of objective support, a conservative treatment course, Jamie Y.'s impairments responded well to treatment, and she retained the ability to perform some activities of daily living. (Filing No. 12 at 19.)

While Jamie Y. takes issue with many of the ALJ's relevant conclusions, the Court has already analyzed several of the rationales while addressing her previous assignments of error and found those conclusions to be supported by substantial evidence. For example, the ALJ is permitted to consider the effectiveness of treatment, including surgery, in making his credibility determination. *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018); 20 C.F.R. § 404.1529(c)(3)(iv). As detailed above, Jamie Y.'s treating spinal surgeon indicated that she had

responded well to surgery, including with clinical improvement of the neurological signs and symptoms effecting her lower extremities.  The specialist contemplated the ongoing need for only conservative treatment, released her back to normal activity without restrictions, and thought her pain was a product of deconditioning and failure to properly rehabilitate her condition.  Jamie Y. testified that she had completed physical therapy since her surgery and was taking narcotic pain medication, but she had not had any further injections.  (Filing No. 10-2 at 51.)  She had limited follow-up visits with her spinal surgeon, no further surgery was contemplated, and he was satisfied with the progress of the fusion.  Inconsistencies with the severity of symptoms reported at the hearing and those reported while seeking treatment or the failure to regularly seek treatment for those symptoms can support an ALJ's credibility finding.  *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 803–04 (7th Cir. 2005).  The record provided a reasonable basis for the ALJ to conclude that the impairments Jamie Y. specifically alleged as the basis of her claim had improved with treatment.

The ALJ also supplied rationales for concluding that her other impairments were not disabling.  The ALJ explained that

> Additionally, there has been very little treatment for headaches, hypersomnia, and narcolepsy.  Although the claimant testified regarding a four-year history of headaches (four times per week with each lasting four hours to all day), she was working throughout this time.  She further testified that she sleeps more than she is awake, but there is no evidence that she is unable to stay awake when active in a light job.  In fact, she reported being able to stay awake while driving (Exhibit 4F/1).

(Filing No. 10-2 at 18.)  The demonstrated ability to work with an impairment or impairments— absent evidence showing the impairments have worsened—is substantial evidence supporting an ALJ's conclusion that "long-standing complaints" did not render the claimant disabled.  *Castile*, 617 F.3d at 927–28.

Jamie Y. testified that her migraines had not prevented her from working as a home health aide. (Filing No. 10-2 at 49-50.) The record also showed longstanding issues with hypersomnia. Prior to Jamie Y.'s alleged onset date and an eventual diagnosis of narcolepsy, she described to her mental health provider how her hypersomnolence affected her functioning:

> She stated that she has days where she is very depressed and she sleeps all the time. She noted that she will start crying out of nowhere, will tell her mother she wants to quit her job. She has low motivation, has reported anhedonia, and does not want to do anything besides sit inside and sleep. She will attend her son's baseball games though. She is not "up for it anymore" most of the time. She will go to work, but does not want to be there. She noted that there are days where she drives around town so that she won't go home and go to sleep. She noted that her symptoms are present every day.

(Filing No. 10-11 at 2.) Again, the ALJ's rationales were tied to the record and the evidence provided a reasonable basis to support his conclusions. According to the deferential standard, nothing more is required of the ALJ for his credibility determination to survive review.

## V. CONCLUSION

"The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). For the reasons stated above, the Court finds no legal basis to reverse the ALJ's decision. The final decision of the Commissioner is **AFFIRMED**. Jamie Y.'s appeal is **DISMISSED**.

SO ORDERED.

Date: _7/15/2020_

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael G. Myers
mgmyers10@sbcglobal.net

Alison T. Schwartz
SOCIAL SECURITY ADMINISTRATION
alison.schwartz@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov